535 So.2d 1330 (1988)
Ralph L. SMITH
v.
Warren L. GOTTSEGEN, M.D.
No. 88-CA-425.
Court of Appeal of Louisiana, Fifth Circuit.
December 14, 1988.
*1331 Donna S. Cummings, New Orleans, for plaintiff-appellant.
Lawrence L. McNamara, Lisa M. Tompkins, Elaine W. Selle, New Orleans, for defendant-appellee.
Before CHEHARDY, KLIEBERT and WICKER, JJ.
WICKER, Judge.
This appeal arises from a medical malpractice suit filed on behalf of Ralph L. Smith, plaintiff/appellant, against Dr. Warren L. Gottsegen, defendant/appellee.[1] The trial judge rendered judgment in favor of Dr. Gottsegen, dismissing Smith's suit. Smith now appeals. We affirm.
Smith was injured in an automobile accident in 1980. Following the accident he received treatment from Dr. Otearo, a general physician. On May 11, 1981 Smith entered treatment with Dr. Gottsegen, a expert in the field of thoracic surgery.
Smith complained to Dr. Gottsegen of radiating pain and tingling in both arms and hands. He also indicated that it was difficult for him to hold objects.
Dr. Gottsegen diagnosed Smith as having bilateral Thoracic Outlet Compression Syndrome (TOCS). He treated Smith for approximately ten months with conservative measures. The treatment involved referral to a physical therapist and medication.
On February 11, 1982 Dr. Gottsegen recommended surgery. Following the recommendation for surgery, Smith entered East Jefferson General Hospital on March 3, 1982 for a resection of his right first rib by the less commonly used posterior approach [parascapular incision]. The surgery was performed by Dr. Gottsegen with Dr. Terry O'Donovan's assistance on March 5, 1982. Dr. O'Donovan is a specialist in cardiovascular and thoracic surgery.
On March 9, 1982 Smith was discharged from East Jefferson General Hospital. He returned to the emergency room on March 10, 1982 with complaints of pain in his shoulder and concern about infection in the area. He was seen by Dr. O'Donovan who advised Smith there were no signs of infection.
On March 15, 1982 Smith went to Dr. Gottsegen for his post-operative visit in order to remove the staples from the surgical area. After the staples were removed fluid escaped from the wound. A second admission to East Jefferson General Hospital followed on that date.
On this second admission Dr. Gottsegen diagnosed Smith as having wound dehiscence. Surgery was required in order to reclose the wound. The wound closure operation occurred on March 16, 1982. Smith was discharged on March 26, 1982.
Smith continued to see Dr. Gottsegen a few times following the surgery. He terminated treatment with Dr. Gottsegen after August, 1982, and subsequently saw Dr. Laxaan Kewalramani, an expert in the field of orthopedics and physical and rehabilitative medicine.
Dr. Kewalramani felt Smith had winging of the right scapula and patch hypesthesia (decreased sensation) along both extremities. He described winging of the scapula as occurring when "the muscles which are *1332 connected [to the scapula] are unable to hold the scapula against the rib cage and the scapula stands out like a wing."
Smith's complaints at the time of trial were pain in the right neck-shoulder angle, tingling and numbness, weakness of his shoulder girdle and pain in the neck area.
Dr. Kewalramani believed the wound dehiscence to be the major cause of the winged scapula. He felt the wound dehiscence was caused by a hematoma and not infection.
Smith's claims against Dr. Gottsegen and East Jefferson were heard before a Medical Review panel. The panel found no negligence. Thereafter, Smith filed suit. He now appeals an adverse ruling in favor of Dr. Gottsegen.
On Appeal, Smith specifies the following errors:
1. That the trial court erred, as a matter of law, in the interpretation of La.R. S. 9:2794, and thus allowed expert witnesses to testify regarding matters not within the province of their "ordinary practice," and
2. That the trial judge erred in giving weight and credibility to the testimony of witnesses who testified that a procedure outside their "ordinary practice" under La.R.S. 9:2794 was not a deviation from the standard of care.
Plaintiff has the burden of proof "to establish that a health care provider, [such as Dr. Gottsegen] deviated from the required standard of care." Mariano v. Tanner, 497 So.2d 1066 (La.App. 5th Cir.1986), writ denied 501 So.2d 235 (La.1987). La. R.S. 9:2794(A) sets out the test for meeting the burden of proving malpractice. It provides:
A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq. ... the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
Appellant interprets La.R.S. 9:2794(A)(1) to mean that the appropriate standard of care is established by what members of a specialty do as opposed to what they define as acceptable practice. Thus, under appellant's interpretation Dr. Gottsgen breached the standard of care by performing a right rib resection for TOCS through the less commonly used posterior approach. Appellant views the trial court as having erred for failing to infer that the physician who performs a right rib resection for TOCS through the posterior approach is negligent for performing the operation in a different manner than other specialists in that area.
Smith feels his position is strengthened by the recent Louisiana Supreme Court opinion in Tommy Dupre Pitre, Et. Al. v. Opelousas General Hospital, Et. Al., 530 So.2d 1151 (La.1988).
In Pitre, supra at 1156, the court explained La.R.S. 9:2794(A)(1) as follows:
The violation of these obligations constitutes a fault which must be evaluated, taking into account the professional practices and customs by comparing the conduct of the author of the damage with the normal and regular activity of a person exercising the same profession [citation omitted].
However, despite appellant's assertions to the contrary we do not read Pitre as short circuiting the standard of proof outlined *1333 in La.R.S. 9:2794 by allowing the trial court to infer negligence whenever a physician uses a less common procedure. "The plaintiff must prove his case through medical testimony as to the prevailing community standard." Cable v. Cazayou, 351 So.2d 797, 800 (La.App. 1st Cir.1977).
The trial judge correctly noted in his reasons for judgment:
Plaintiff's expert, Dr. Effler, testified that he found no fault with the posterior approach. Dr. Kewalramani testified that the transaxillary approach is the customary approach. He also testified that he has used the posterior approach for other surgery.
Dr. Gottsegen testified that he didn't think he could get adequate exposure of the operative area with the transaxillary approach in a man the size of plaintiff.
Dr. Race testified that the panel felt the reasons given by defendant for posterior approach were valid.
The court therefore concludes that given the particular facts and circumstances of this case that the selection of the posterior approach was in accordance with proper medical standards and Dr. Gottsegen was not negligent simply because he chose to use the posterior approach.
The trial judge had ample testimony upon which to base his conclusion that Dr. Gottsegen did not breach the standard of care by choosing the posterior approach. We further note the following: Dr. Kewalramani testified that the most common approach is the transaxillary one. The next one used in frequency is the supraclavicular and the third is the posterior.
Dr. Frank Schmidt, an expert in thoracic surgery, stated that although he has not used the posterior approach for first rib resection, he did use it for other thoracic surgical procedures in the range of 50 operations. A number of these operations approached the level of the first rib. In his opinion the posterior approach was the appropriate one in this instance for his specialty. He explained that thoracic surgeons have to make judgments on the basis of how the patient presents at the time. In his opinion Dr. Gottsegen adhered to the standards of thoracic surgeons.
Dr. Schmidt further stated that infection and wound dehiscence are not in and of themselves signs of surgical error. Dr. Jack L. Race, an expert in thoracic surgery, agreed.
Dr. Race stated he used the posterior approach for other disorders. He felt the reasons given by Dr. Gottsegen for the use of this approach were "adequate". The use of the posterior approach was an acceptable approach in conformity with the standards of his specialty. He knew of no negligent acts on Dr. Gottsegen's part which caused infection, wound dehiscence or the winged scapula. In his opinion Dr. Gottsegen adhered to the standards of care of a thoracic-cardiovascular surgeon in his care of Smith.
Dr. O'Donovan testified that the posterior approach was used in Smith's case because he was very heavily built and had the type of musculature which made the posterior approach preferable to the axillary one.
The advantage of the posterior approach is that it is considerably easier to use than the axillary method. He likened the axillary method to be like working in a tunnel. In Smith's case the tunnel would have been thicker. Another advantage of the posterior approach is that the first rib is closer to the surgeon. He indicated the only difficulty with the posterior approach is that the surgeon has to cut through muscle; whereas, the axillary approach does not require such a cut through muscle tissue.
In his opinion, the posterior approach was a good one. Its use conformed to the standards of his specialty. Dr. O'Donovan also reported using the posterior approach before on a thick-set, heavily muscled person. He did not recall any difficulties with his use of the posterior approach in that particular surgery.
Dr. O'Donovan stated he understood Smith developed an infection and wound dehiscence following the surgery. Infection can cause wound dehiscence without there being any other reason. Both the *1334 wound dehiscence and infection were properly treated by Dr. Gottsegen. The condition of winged scapula does not mean negligence on the part of Dr. Gottsegen.
If he were to see someone with TOCS who had Smith's build, he would consider the posterior approach. The posterior approach may be tricky, but it can be an excellent approach. He has struggled with the use of the axillary approach, the "approach of choice" in heavily muscled individuals involving a great deal of difficulty where he could very easily get into "nasty trouble." In such an instance, the axillary approach would take three times as long as the posterior one.
Dr. Donald Bryan Effler, an expert in the field of thoracic surgery and cardiovascular surgery, was specifically asked, "[Y]ou are not faulting Dr. Gottsegen's use of the posterior approach on Mr. Smith, are you?" He responded, "Not particularly, no." He further stated that for those who believe in TOCS, the posterior approach for first rib resection is acceptable.
Furthermore, Dr. Effler stated that wound dehiscence is a complication of surgery which can occur in the best of surgical hands as can infection. These complications can occur from all three surgical approaches.
Dr. Gottsegen testified the posterior approach allows for easy access to the first rib without risking major vascular damage. In choosing the posterior approach for Smith, he considered Smith's welfare to be of primary importance. Moreover, the standards of his specialty do not require the use of the transaxillary approach. He used the posterior approach once before for TOCS and several times in thoroplasty surgery. He most often uses the transaxillary. However, he individualizes each case.
In Smith's case he chose the parascapular incision because Smith was large and heavily muscled and he felt the axillary approach might be dangerous. Smith has a large, bulky, musculature in and about the shoulder girdle and neck which would present significant difficulties with the transaxillary approach. He explained:
In large, heavily muscled individuals to use the transaxillary approach requires major traction on that extremity and it requires in many circumstances even a catapult traction rather than a person traction because of the muscle tension. When there is the traction problem and retraction difficulties it gives me a problem because I'm a little bit reluctant to dissect around arteries, veins and nerves unless I have a good and adequate exposure. For that reason we're reluctant to use the transaxillary approach.
Therefore, upon review of the record we find no manifest error nor do we find the trial judge misapplied the standard of proof.
Accordingly, for the reasons set forth the judgment dismissing plaintiff's claim against Dr. Gottsegen is affirmed. Appellant is to pay costs.
AFFIRMED.
NOTES
[1] The second defendant, East Jefferson General Hospital, had been dismissed from the case prior to trial.