593 So.2d 783 (1992)
Lyrissa WILLIAMS
v.
HOTEL DIEU HOSPITAL.
No. 91-CA-0687.
Court of Appeal of Louisiana, Fourth Circuit.
January 16, 1992.
*784 Kim M. O'Dowd, O'David & O'David, New Orleans, for plaintiff/appellant.
Charles A. Boggs, Betty P. Westbrook, Boggs, Loehn & Rodrigue, New Orleans, for Keith C. Ferdinand, M.D.
H. Martin Hunley, Jr., Peter E. Sperling, Lemle & Kelleher, New Orleans, for A. David Slater, M.D.
Before SCHOTT, C.J., and LOBRANO and PLOTKIN, JJ.
PLOTKIN, Judge.
Plaintiffs, survivors of Isabell Williams, appeal the trial court's judgment dismissing their medical malpractice claims against defendants, Keith Ferdinand, M.D., A. David Slater, M.D., and their insurer, St. Paul Fire & Marine Insurance Company. We affirm.
*785 Facts:
In 1983, Isabell Williams was hospitalized at Hotel Dieu Hospital by her family physician and cardiologist, Drs. Green and Ferdinand. At this time, test results revealed that Mrs. Williams had a very serious heart valve condition. Mrs. Williams was readmitted to Hotel Dieu Hospital on January 11, 1984 for further testing, which ultimately indicated a considerable deterioration in Mrs. Williams' condition. Subsequently, Dr. Ferdinand consulted with a group of cardiovascular surgeons and had Mrs. Williams evaluated for surgery. Two of the surgeons, Drs. David A. Slater and Rudolph Weichert, evaluated Mrs. Williams and recommended replacement of both the mitral and aortic valves. This double-heart valve replacement was the only option available to alleviate Mrs. Williams' serious condition.
Surgery was successfully performed by Drs. Slater and Weichert at Hotel Dieu Hospital on January 16, 1984. Mrs. Williams' post-operative recovery was uneventful, and she was discharged from Hotel Dieu Hospital by Dr. Ferdinand, with Dr. Slater's concurrence, on January 25, 1984.
As a result of Mrs. Williams' condition and surgery, she was issued a prescription for coumadin, which is an anti-coagulant medication which thins the blood. This medication was prescribed to prevent her blood from clotting in her newly-replaced heart valves, reducing the risk of a possible stroke. The process of thinning Mrs. Williams' blood had already begun while she was under post-operative care at Hotel Dieu Hospital. Her blood clotting time, also known as the prothrombin time, had been tested periodically prior to her discharge, revealing no significant abnormality.
Just prior to her discharge on January 25, 1984, Mrs. Williams' prothrombin time was 32.1, which was within normal limits but at the high range. Because of this level, Dr. Slater instructed Mrs. Williams not to take that evening's coumadin tablet. Another prothrombin time test appointment at New Orleans General Hospital was scheduled for Friday, January 27, 1984.
Following her discharge on Wednesday, January 25, 1984, Mrs. Williams was taken to her brother's home in Gretna, Louisiana, to recuperate.
Dr. Ferdinand next spoke with Mrs. Williams by telephone on January 26, 1984. While speaking with Dr. Ferdinand, Mrs. Williams related various non-specific complaints. As a result, Dr. Ferdinand suggested that Mrs. Williams meet him at Hotel Dieu Hospital. Upon arrival at Hotel Dieu, Mrs. Williams and Dr. Ferdinand were informed that Mrs. Williams had no additional Medicaid hospital days available. Regardless, Dr. Ferdinand questioned Mrs. Williams about her symptoms, emphasizing questions pertaining to bleeding. The examination revealed no signs of a critical situation. However, Dr. Ferdinand offered to accompany Mrs. Williams to Charity Hospital to see to it that she be admitted; Mrs. Williams refused.
On Friday, January 27, 1984, a prothrombin time test was performed on Mrs. Williams, revealing an excessively high prothrombin level of 55.8. After being informed of the test results, Dr. Ferdinand again telephoned Mrs. Williams to question her about any signs of bleeding; he also instructed her not to take any more coumadin tablets. Additionally, he told Mrs. Williams to contact her family physician, Dr. Green, on Monday.
On Saturday, January 28, 1984, Dr. Ferdinand again spoke with Mrs. Williams, questioning her about her condition. Once again, Dr. Ferdinand questioned Mrs. Williams about all possible sites of bleeding; Mrs. Williams told him that she had no bleeding and that she was in fact feeling better. Later that evening, Dr. Ferdinand received a phone call informing him that Mrs. Williams' condition had become worse and that she was being taken to New Orleans General Hospital. Dr. Ferdinand met Mrs. Williams at New Orleans General and upon examining her, had her transferred to Hotel Dieu Hospital where more sophisticated facilities were available.
*786 At Hotel Dieu, Mrs. Williams' prothrombin level tested at the extremely high level of 95. Such a high level indicates a large amount of coumadin in the system, far more than the one 5 milligram tablet which she had been instructed to take. Drs. Pearce and Slater subsequently performed a pericardiocentesis, a procedure to free blood causing pressure on the heart muscle. This procedure only rectified the problem temporarily, requiring Drs. Slater and Pearce to perform surgery. Surgery was performed at around 8:30 p.m. on Saturday, January 28, 1984, but was unsuccessful. Mrs. Williams died at 6:25 a.m. on Sunday, January 29, 1984.
Although Dr. Slater requested an autopsy, the family declined. Dr. Slater estimated that the cause of death was cardiac tamponade probably caused by hemorrhage into or around the pericardial sac.
Standard of care:
LSA-R.S. 9:2794 provides, in pertinent part, that in a malpractice action plaintiff shall have the burden of proving the following things:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances;
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

Maxwell v. Soileau, 561 So.2d 1378 (La. App. 2nd Cir.1990), writs denied 567 So.2d 1123 and 567 So.2d 1124 (La.1990).
In their attempt to meet this burden of proof, plaintiffs rely heavily on the expert testimony of Dr. Nathaniel E. Reich. Dr. Reich's status as an expert in cardiology and cardiac surgery was challenged by both defendants. Although he was tendered as an expert in internal medicine and cardiology, Dr. Reich testified that he was not board certified in cardiology, has never practiced as a cardiac surgeon, and has never been licensed to practice in Louisiana. The 83-year-old doctor further stated that he has been testifying as an expert roughly once or twice a month for approximately the last 30 years, and, additionally, that he would receive $5000 for his expert testimony.
Initially, Dr. Reich rendered a written opinion in this matter on June 25, 1986 to Saponaro, Inc., a corporation which provides expert witnesses to litigants for a fee. In this report, Dr. Reich stated that Dr. Ferdinand was negligent in the care of Mrs. Williams. It was later discovered that Dr. Reich rendered this opinion prior to reviewing the complete medical record. Additionally, Dr. Reich had failed to read any of the depositions, including the deposition of Dr. Ferdinand.
Further suspicion was cast on Dr. Reich's testimony when he testified that "Mrs. Williams' second surgery should have been preceded by a pericardiocentesis." In fact, a pericardiocentesis had been performed. When questioned about this, Dr. Reich stated that he was not sure whether this procedure had occurred.
Plaintiffs also rely on the testimony of Dr. George Barnes. Dr. Barnes testified that;
I feel there is some concern here about that patient not being cared for in the hospital setting. I think that would be the standard of care for the patient with that evaluation.
However, a review of Dr. Barnes' testimony as a whole shows that Dr. Barnes did not believe that Dr. Ferdinand breached the standard of care. Dr. Barnes, a cardiovascular surgeon, testified as follows:
As a cardiologist, Dr. Ferdinand would have an opportunity to develop a long term relationship with Mrs. Williams while a cardiovascular surgeon would meet the patient only for the purpose of surgery.
Dr. Barnes further testified as follows:
If a cardiologist did have a longstanding relationship with a patient and believed *787 the patient to be reliable, the cardiologist could communicate with a patient over the telephone and further, there would be nothing inherently wrong with that level of contact with a patient or his advice to the patient.
In response to examination by counsel for plaintiffs, Dr. Barnes also stated as follows:
Certainly, it seems that Dr. Ferdinand was aware of the patient's prothrombin time. He had seen the patient and was in contact with the patient much more frequently than perhaps many cardiologists are after a patient is discharged. I don't think Dr. Ferdinand was hard to reach or unavailable to the patient or had not made an effort to get her to come into the hospital, undergoing the assumptions that were presented to me at this time in court. I can only say he did make an effort to admonish the patient, come into the hospital and as I understand it, she refused admittance to Charity Hospital, the only hospital in this city that would accept her under the circumstances.
When questioned about the care administered by Dr. Slater, Dr. Barnes responded by describing the care as "exemplary." Dr. Reich also had no criticisms concerning the standard of care performed by Dr. Slater while caring for Mrs. Williams.
The factfinder has a duty to assess the demeanor and credibility of all the witnesses, lay and expert, and this determination of fact should not be disturbed unless found to be clearly erroneous. Boehm v. Bienemy, 508 So.2d 159, 162 (La.App. 4th Cir.1987). Additionally, when a factfinder's decision is based on a decision to "credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong." Rosell v. ESCO, 549 So.2d 840, 845 (La. 1989).
After reviewing the testimony of all the witnesses, particularly plaintiff's expert's testimony, we find that the jury's determination that the defendants did not breach the standard of care was not clearly erroneous. Plaintiff's first assignment of error has no merit.
Jury Interrogatories:
Plaintiff contends that the interrogatories presented to the jury were improper because they referred to the defendants' medical specialties. There is no objection to the law charge.
Plaintiff argues that coumadin is prescribed by doctors in multiple medical specialties and that its dosage, risks, and known dangers, are generally well known to the medical profession. Additionally, plaintiff argues that all physicians who prescribe coumadin, regardless of their specialty, are subject to a standard of care of the regular practice of medicine. Therefore, they urge that the jury was confused and misled by the interrogatories because they could only use a cardiologist's expert testimony against the defendant cardiologist, and an expert cardiovascular surgeon's, against the defendant cardiovascular surgeon.
The jury interrogatories asked:
Do you find that plaintiffs have shown by a preponderance of the evidence that the defendant, Dr. Keith Ferdinand, in his treatment of his patient, Isabell Williams, lacked the degree of knowledge or skill possessed or the degree of care ordinarily exercised by practitioners in his specialty of cardiology or that he failed to use reasonable care and diligence along with his best treatment in the application of that skill in his treatment of the patient?
In cases involving errors committed by a physician who may have prescribed the wrong medication or wrong dosage, the factfinder may consider all the evidence relating to the drug or dosage, including direct and side effects. For the purposes of determining negligence, a defendant's conduct is to be evaluated in terms of professional standards and the state of medical science. A practitioner in a specific school, such as a cardiologist or a cardiovascular surgeon, shall be judged in accordance with the standards of that specialty which is usually a higher standard of care.
*788 We conclude that although the drug coumadin may be used generally, the better approach in drug use or misuse malpractice cases is that a physician's conduct should be evaluated by the standard of care of his specialty. Expert testimony may be introduced to establish the drug standards and their violations, but whether the medical defendant violated the standard of his specialty is a fact question.
We find that the interrogatories submitted conform to La.R.S. 9:2794, La.C.C.P. art. 1813, and Courtney v. Winn Dixie Louisiana, Inc., 447 So.2d 504 (La.App. 5th Cir.1984), writ denied 449 So.2d 1359 (La. 1984). The interrogatories reflect the applicable law. The jury received all evidence related to coumadin and decided that the defendants did not violate their standard of care. Thus, plaintiff's assignment of error is without merit.
Prejudicial Statements:
Plaintiff's third assignment of error on appeal is that the trial court improperly refused to grant a new trial based on alleged prejudicial statements of defense counsel in closing arguments. Plaintiff contends that counsel for Dr. Ferdinand made erroneous and prejudicial remarks in his summation to the jury concerning medications prescribed to and used by the decedent, Mrs. Williams. However, these alleged prejudicial remarks were not recorded and are not part of the record on appeal.
An appellant who raises an assignment of error has a duty to provide a transcript or narrative of facts agreed upon by all parties. Where he does not provide either, the court of appeal must presume that the trial court's judgment was supported by competent evidence and should be affirmed. Deliberto v. Deliberto, 400 So.2d 1096 (La.App. 1st Cir.1981).
Having no evidence of any such impropriety, we have nothing to review. Thus, plaintiff's contention that the trial court erred in declining to grant a new trial because of this alleged prejudicial statement on the part of defense counsel has no merit.
For the above and foregoing reasons, the trial court judgment dismissing plaintiff's medical malpractice claims against the defendant is affirmed.
AFFIRMED.