652 So.2d 36 (1995)
Cathy GAMINO
v.
LAKESIDE HOSPITAL, Dr. Donald Guzzetta and Dr. Robert Miller.
No. 94-CA-727.
Court of Appeal of Louisiana, Fifth Circuit.
February 15, 1995.
Robert J. Caluda, Richard L. Root, New Orleans, for plaintiff/appellant, Cathy Gamino.
Charles A. Boggs and Terry B. Deffes, Boggs, Loehn & Rodrigue, New Orleans, for defendants/appellees, Lakeside Hosp., Dr. Donald Guzzetta and Dr. Robert Miller.
*37 Before BOWES, GOTHARD and CANNELLA, JJ.
BOWES, Judge.
Plaintiff/appellant, Cathy Gamino ("Gamino"), appeals a judgment of the district court in favor of the defendants, Dr. Donald Guzzetta and Dr. Robert Miller, dismissing her action in negligence (malpractice) against them. We affirm.

FACTS
Mrs. Gamino was diagnosed in 1974 with the chronic condition of Crohn's disease, an affliction which causes severe inflammation of the bowels. In 1976, she underwent a total colectomy, in which her entire colon, rectum and six inches of the small intestine were removed.
As a result of the surgery, Mrs. Gamino was required to use a colostomy bag to eliminate waste from her body. To facilitate attachment of the colostomy appliance to her body, her surgeon at that time, Dr. Irving Levine, constructed a stoma with a nipple about one inch high, formed out of her small intestine, which protruded from skin level. This is known as a "Brook's stoma".
In 1983, Mrs. Gamino developed a large ovarian cyst which necessitated surgery. Because of her history of Crohn's disease and the colectomy, her gynecologist Dr. Cohen, asked the defendant, Dr. Robert Miller, to be on call in the event that there were complications involving the bowels. On the day of surgery, Dr. Miller was out of town and had arranged for his partner, defendant, Dr. Don Guzzetta, to assist.
A hysterectomy was performed on March 1, 1983. Because some enlarged bowel had adhered to the female organs, Dr. Guzzetta had to release this bowel to enable the hysterectomy to continue. The operation was apparently successful and Mrs. Gamino was released on March 7, 1983. Several days after she went home, plaintiff realized that she had not been able to void, and after consulting her physicians, was readmitted to Lakeside Hospital for diagnosis and treatment. Dr. Guzzetta initially suspected a bowel obstruction or a severe ileus (paralysis) and, since he was unable to thread a catheter through the ileostomy, he attempted unsuccessfully to flush it out. Daily x-rays and other diagnostic tests were performed. By March 16, Dr. Guzzetta felt certain that the problem was a bowel obstruction and surgery was scheduled.
When Dr. Guzzetta opened plaintiff's abdomen, he found a cavity covering the entire abdomen, filled with partly bloody, partly yellowish fluid and a rind of tissue over the intestines. Dr. Guzzetta called Dr. Miller to assist, and the multiple obstructions were removed after a four-hour surgery. In the course of the operation, the Brook's stoma had to be removed as it was also totally obstructed. For reasons stated hereinafter, the surgeons then constructed a flat stoma rather than another Brook's stoma.
Plaintiff filed an action for malpractice against several physicians, including defendants, as well as against Lakeside Hospital. In the petition, it was generally alleged that she suffered a "continual and worsening condition relative to the continuing intestinal complaints which have resulted from the aforementioned surgery". Prior to trial, all defendants, except Drs. Guzzetta and Miller, had been dismissed.
At trial, the thrust of plaintiff's complaints centered on the type of stoma constructed by the defendants. Mrs. Gamino contended that the Brook's stoma permitted her to lead a relatively normal life, allowing her to travel, go out dining and dancing, etc.; and that the flat stoma requires far more time and effort to contend with, and results in skin irritation, pain, and severe inconvenience and diminishment of her lifestyle. Trial was held over a five day period in March of 1994, following which the court rendered judgment in favor of the defendants. The reasons for judgment read in pertinent part as follows:
The court finds from the testimony of the experts that Drs. Guzzetta and Miller did not violate the standard of care in forming a flat stoma on Mrs. Gamino. A physician's conduct should be reasonable under the circumstances existing when his professional judgment is exercised. A physician is not held to a standard of perfection nor evaluated with the benefit of *38 hindsight.... After four hours of surgery and with Mrs. Gamino's abdomen being full of adhesions and thickened bowel, the defendants were not negligent for failing to construct a Brooks' stoma. They exercised their best surgical judgment, as well as reasonable care, during Mrs. Gamino's surgery.
From this judgment plaintiff appeals.

SPECIFICATION OF ERROR
Plaintiff urges that the trial court erred in granting judgment in favor of defendants when the evidence presented at trial clearly revealed that appellant proved, by a preponderance of the evidence, that defendants provided substandard medical care and thus were guilty of malpractice. The argument on appeal concentrates on the issue of whether it was substandard medical care to create a flat stoma instead of the preferred Brook's stoma.

TESTIMONY AND EVIDENCE
At trial, Dr. Guzzetta testified that when he opened plaintiff's abdomen in the second surgery, he saw something he had never seen before or since, and described the fluid filled cavity and rind covering the intestines as follows:
The rind was stuck to the intestines and had to be dissected, or pealed [sic], or cut off of the bowel. And there was a lot of bleeding that occurred when this happened, we had to give her blood during surgery.
And in some places the bowel was thin, and when we tried to get the rind off we accidentally opened the bowel, so that some places had to be sutured closed. There was some segments that were so traumatized by what we were trying to do to free it up that we had to resect the bowel.
* * * * * *
And every time the bowel was opened and entered, fecal, greenish fecal material, that same stuff that comes out of the ileostomy, was going into her abdomen ... all this bowel was basically obstructed, and it was difficult to tell where the actual one obstruction was, causing the whole problem.
The existing Brooks stoma had to be taken out because it was completely obstructed. After it was removed, and while Dr. Guzzetta continued to operate, Dr. Miller tried to stick a hemostat through it and found it was completely blocked. When asked by plaintiff's counsel why a flat stoma was made instead of the Brook's, Dr. Guzzetta replied as follows:
"Two reasons. Number one, it was impossible to pull the bowel out any further than we did, because of the tension on the mesentery, which was thick, and that's where the blood supply comes from. If there's too much tension on the blood supply, the end of the bowel dies. So, it was tedious to get as much as we got, because in order to pull the bowel out, you have to remove some of the mesentery from the bowel itself ... and it saved time."
The doctor explained that if the Brook's stoma could have been made at all, that it would have taken another forty minutes and
When you do that, you're taking a chance of obstructing the blood supply. And in my judgment, I didn't thinkI didn't want to gamble on this lady's life by going back and making something that might take forty (40) minutes, and maybe even take longer, I don't know..... I just used forty (40) minutes as an educated guess.
Dr. Guzzetta agreed, and the defense stipulated, that the Brook's stoma is preferable to the flat stoma. He also agreed that plaintiff was not in danger of dying on the operating table. Rather, his concern was about possible post-operative complicationsMrs. Gamino had suffered some drops in her blood pressure level during surgery; the fecal matter going into her abdomen was also a great concern, ... "she could have been absorbing all these bacteria in her peritoneal cavity. She could be in septic shock at that point. I don't know." Dr. Guzzetta also testified that the type of stoma to be made was not discussed prior to surgery.
Dr. Miller testified that in his opinion, the ovarian cyst, which was inadvertently ruptured of its gelatinous contents at the first *39 surgery, caused the rind. He also opined that gynecological surgery is the most common cause of intestinal obstruction, since removal of the reproductive organs also necessitates removal of a certain amount of peritoneum. When he entered the operating room, Dr. Miller saw a "dense rind that looked like it was another layer of the abdominal wall.... it was thick, very firm, ... you could see that it was a loop of intestine underneath it ..." He stated that he has seen it in limited degrees before, but never covering the entire abdominal cavity as in the plaintiff's case. The rind caused the intestinal obstruction, and had to be carefully dissected away from the intestine and get each loop of the intestine free.
An obstruction in the distal ileum was discovered, but the doctors suspected another one; upon investigation, they found that the ileostomy was also obstructed and would have to be removed. There were at least two more obstructions, plus a kink which had to be removed. Dr. Miller stated that when an abdomen has been recently operated on, twice in two weeks, there is a risk that intestinal matter can be absorbed into the general system, causing septic shock. In addition, more scar tissue is formed. The longer the patient is under anesthesia and in surgery, the more susceptible they are to having post-operative complications such as pulmonary problems, septic problems, and others. Dr. Miller felt that the mesentery border of plaintiff's intestine was very thick, taking a lot of room in the ileostomy hole, and was so thick that it could not be pushed through to do a Brook's stoma. He felt, unlike Dr. Guzzetta, that it couldn't be done at all stating:
... but even if you had, you know, it would take forever to that, if you could do it. And I just know you can't do it.
Dr. Miller felt that plaintiff was a poor surgical candidate, with active disease in her rectum and was also very frail. The danger of her dying was not so much during surgery, but of post-operative complications, stating:
And it really, itthe ileostomy, in our minds, whether we did a Brook's, if we even had that choice, was not the thing that was our driving force. Our driving force was to get a live patient without any serious complications, off the table. And that's what everything was geared for.
Plaintiff called as a witness Dr. Irving Levine, who performed plaintiff's colectomy in 1977. He testified that after that surgery, in which he constructed the original Brook's stoma, Mrs. Gamino did well, seeming to live a normal life with a normal fitting (ileostomy) appliance. After reviewing the records he agreed with defendants that the operative report did not indicate that plaintiff was in danger of dying during surgery. He further stated that it is unusual if a surgeon is unable to construct a Brook's stoma because of the condition of the bowel. When asked if there was any reason based on the records, that a Brook's stoma could not have been constructed, he stated that the problem was with the rind on the intestine and multiple adhesions. He further said the limiting of the surgery "was not due, according to the record, to the instability of the patient, but may have, in fact been due to the fact of the difficulty involved in pulling out enough small intestine and mesentery in order to evert the bowel which was easy to perforate."
What concerned Dr. Levin considerably was the process of removing the rind to free the intestine. He did not think that the failure to form the Brook's stoma was a deviation from the standard of care because of the type of intestine that was present. It was not that the intestine could not be raised, but it could not be everted (turned outward) to form the nipple. While he did not think that such construction was impossible, he stated that it would be "very difficult and it might be dangerous" and that he would defer to the surgeon's call. He also said that, depending on her present condition, the stoma could still be revised to construct a Brooks stoma. He testified that plaintiff's current problems with fluid leaking from her appliance could be caused by a flat stoma, but could also be caused by recurrent Crohn's disease, with which plaintiff was afflicted.
Dr. Claude Craighead, also a general surgeon, and a defense witness, testified that the Crohn's disease, as well as the recent *40 surgery, caused the thickened bowel and that it is difficult if not impossible to invert such a rigid bowel to do a Brook's stoma. Encased in the mesentery are blood vessels. Crohn's disease and the inflammatory process shortens the mesentery, and in making the Brook's stoma, it is necessary to get a blood supply to it or the bowel to the mesentery. Otherwise, the bowel, and possibly the patient, will die in such an attempt.
Dr. Craighead felt that the defendants had followed the standard of care in the community. He also felt that plaintiff was fragile, and that her blood pressure levels during the operation evidenced tachycardia. In response to a question from the court Dr. Craighead stated unequivocally that a Brook's stoma could not have been constructed in this case.
Dr. James Corcoran, a general surgeon, also testified for the defense. After reviewing all the records in this case, he testified that the surgery performed by defendants was definitively within the standard of care in the community for a patient with a condition such as the plaintiff's. He also felt that the condition and length of the bowel would not have permitted the construction of the Brook's stoma.
Dr. Frank DiVincenti, a general surgeon, also testified for defendants. He reviewed all the records and depositions pertinent to the case. Dr. DiVincenti agreed that when the fecal matter falls into the peritoneum during surgery, as in plaintiff's case, an extremely dangerous situation is created and the toxins can be absorbed into the bowel, possibly causing septic shock. The most common reason why a raised stoma would not be created is the condition of the bowel, if it is inflamed, rigid, swollen, etc. While he also agreed that Mrs. Gamino was not in extremis on the operating table, he opined that under the conditions faced by the surgeons, that they did the only thing they could at the time, and that their actions did comply with the applicable standard of care in this community.
Dr. George Paul, plaintiff's expert witness and a general surgeon, testified via deposition. He stated that a flat stoma has been an outdated procedure for 40 years. Dr. Paul felt that Dr. Guzzetta did not meet acceptable standards of care in the first surgery involving plaintiff, because neither he nor Dr. Miller, who was originally scheduled as surgeon, saw plaintiff prior to surgery, to derive her history and her present status, nor did Dr. Guzzetta make any notations on the surgical chart of that operation. As a surgeon, Dr. Paul would always introduce himself to the patient, discuss any problems, and obtain a specific operative consent.
Dr. Paul felt that Dr. Guzzetta should have sent a specimen of the resected bowel (from the first surgery) to pathology for analysis, and that failure to do so was a deviation from the standard of care. When Mrs. Gamino was readmitted to the hospital in March, Dr. Paul opined that it was inappropriate care for Dr. Guzzetta to attempt to pass the catheter through the stoma in order to break up the intestinal obstruction, and that this attempt caused a perforation of the ileum next to the stoma. He based this opinion on the pathology report disclosing a defect or perforation of the bowel in that area; that perforation, according to Dr. Paul, caused the massive generalized peritonitis found in plaintiff.
Additionally, in his opinion, Dr. Paul felt that Dr. Guzzetta waited too long to request radiologic studies and to perform the second surgery. According to this expert, Dr. Miller should have been present when surgery commenced. Dr. Paul felt that it was inappropriate to attempt to surgically remove all the adhesions in the bowel, because it caused holes in that bowel and the plaintiff's intestines required a minimal amount of handling. He also stated he thought that it was inappropriate to attempt to pass a small catheter during the surgery through a portion of the bowel. He said a flat stoma should only be done in extremis or when there is absolutely no bowel available to gain the extra tissue. Dr. Paul was also of the opinion that an everted "Brook's" stoma takes only four or five minutes longer than a flat one. There was nothing in the operative report to suggest that plaintiff was in trouble.
Dr. Paul placed much emphasis on the failure of the defendants to document certain *41 aspects of the case in the plaintiff's record. He believed that the operative report should have contained a specific discussion as to why the Brook's stoma could not have been constructed. He felt that it was not proper to have created the flat stoma under the circumstances. As he stated:
I would not use that technique. I would not form a permanenta permanent flat stoma ... There are other things that could be done. He could have changed the site of his incision to ... he would have gained two inches immediately. He could have furthered the disection in the area and would have freed up some more bowel. Obviously if you freed up three inches of bowel, he could have freed up four inches of bowel.... And if I couldn't do that, rather than give her a permanent flat colostomy,... I would close the bowel around that catheter, I would bring the catheter out an I would use the catheter as my ileostomy. I would drain her intestinal contents that way ...
Dr. Paul also found that the defendants' actions, which he felt was negligence, caused a fistula (an opening permitting the secretion of fluids) which required plaintiff's hospitalization.
Mrs. Gamino testified at trial that, as a result of the flat stoma, she has consistent problems attaching her colostomy appliance satisfactorily. As a result, the fecal material and stomach fluid leaks out under the appliance and irritates the skin, causing blisters. During the one to two days when the material is draining, she cannot leave home and is more or less presently housebound. At the time of trial, she weighed only 79 pounds, whereas prior to the surgery she weighed about 92 pounds. She has tried four different kinds of appliances without success.
Mr. Paul Morrison of Morrison's Ostomy and Equipment Center with whom plaintiff consulted, testified that Mrs. Gamino did not express to him that she was having problems with the stoma or the appliances. If a patient has a problem with leakage, he would recommend a different kind of appliance, with convexity, and that Mrs. Gamino had never made such purchases from him. Although several witnesses testified as to her present limited lifestyle, the only person who testified at trial that plaintiff had made complaints about her appliances and stoma was Mrs. Gamino's mother. Two physicians whom plaintiff had consulted (for other medical reasons) had no record of any complaints in that area.

ANALYSIS
As the trial court correctly found, the standard of proof in the present case is found in La.R.S. 9:2794:
Physicians, dentists, and chiropractic physicians; malpractice; burden of proof; jury charge
A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., a dentist licensed under R.S. 37:751 et seq., or a chiropractic physician licensed under R.S. 37:2801 et seq., the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
* * * * * *
C. In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance *42 of the evidence, the negligence of the physician, dentist or chiropractic physician. The jury shall be further instructed that injury alone does not raise a presumption of the physician's, dentist's or chiropractic physician's negligence. The provisions of this Section shall not apply to situations where the doctrine of res ipsa loquitur is found by the court to be applicable.
This circuit has recently interpreted the standard of care in Alello v. Smith, 641 So.2d 664 (La.App. 5 Cir.1994), as follows:
In a malpractice action against a physician, the plaintiff must prove that the defendant physician's treatment fell below the standard of care expected of his peers in the same medical specialty, and must further prove a causal connection between the alleged negligent treatment and the injury sustained. Martin v. East Jefferson Gen. Hosp., 582 So.2d 1272, 1276 (La. 1991); La.R.S. 9:2794. A physician's conduct in the treatment of a patient is always evaluated in terms of professional standards and the current state of medical science. Williams v. Hotel Dieu Hosp., 593 So.2d 783, 787 (La.App. 4th Cir.1992). A physician's judgment is also evaluated in light of facts known at the time of a patient's treatment, not on the basis of hindsight or information later learned. Moore v. Healthcare Elmwood, 582 So.2d 871, 878 (La.App. 5th Cir.1991).
Whether alleged malpractice constitutes negligence is a question for the jury. Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713, 722 (La.1986). The manifest error rule applies in appeals of medical malpractice actions. Martin v. East Jefferson Gen. Hosp., supra. It is the jury's duty to assess the testimony and credibility of all witnesses and to make factual determinations regarding these evaluations. Williams v. Hotel Dieu Hosp., supra.

In a medical malpractice case, "a reviewing court will give great deference to a jury's findings when medical experts express different views, judgments, and opinions on whether the standard of care was met in any given case." Maxwell v. Soileau, 561 So.2d 1378, 1387 (La.App. 2nd Cir.), writs denied, 567 So.2d 1123 and 567 So.2d 1124 (La.1990). Such expert opinions are necessary sources of proof whose views are persuasive, though not controlling, and any weight assigned to their testimony by the jury is dependent upon the expert's qualifications, experience, and studies upon which his testimony is based. Harmon v. Levenson, 534 So.2d 486, 488 (La.App. 5th Cir.1988). When a factfinder's decision is based on crediting the testimony of one or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
[Emphasis added].
The trial judge found, from the testimony of the experts, that defendants did not violate the standard of care in forming a flat stoma. The court also stated that after four hours of surgery and with Mrs. Gamino's abdomen being full of adhesions and thickened bowel, the defendants were not negligent for failing to construct a Brook's stoma, and that they exercised their best surgical judgment as well as reasonable care during Mrs. Gamino's surgery.
One of the most recent expressions by the Louisiana Supreme Court regarding the applicable standard of appellate review was set forth in Ambrose v. New Orleans Police Department Ambulance Service, 93-3099, 93-3110, 93-3112 (La. 7/5/94), 639 So.2d 216, 220:
In Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), this Court held that the court of appeal should not upset the factual findings of a trial court absent manifest error or unless clearly wrong. A proper review, therefore, cannot be "completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court; there must be a further determination that the record established that the finding is not clearly wrong." Id. at 1333. More recently, regarding this constitutional appellate review of fact in civil cases, La. Const. art. 5, Sec. 10, we have had occasion to say in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), a case which involved the review of damages, that "the discretion vested in *43 the trier of fact is `great,' and even vast," and in Stobart v. State, 617 So.2d 880, 882-83 (La.1993), which involved the standard of review of findings of fact, a "court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong,'" and "where two permissible views of the evidence exists, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Id. In each of these cases there was but a perpetuation of the principle set down in Arceneaux.

Notwithstanding the Court's earlier guidance to reviewing courts in Stobart v. State through DOTD, 617 So.2d 880 (La. 1993), it was not our purpose in that case to mandate that the trial court's factual determinations cannot ever, or hardly ever, be upset. Although deference to the factfinder should be accorded, the court of appeal, and the Louisiana Supreme Court, nonetheless have a constitutional duty to review facts. [Louisiana Constitution of 1974, article 5, Sec. 5(C) and 10(D)] Of course, the reviewing court may not merely decide if it would have found the facts of the case differently. Rather, notwithstanding the belief that they might have decided it differently, the court of appeal should affirm the trial court where the latter's judgment is not clearly wrong or manifestly erroneous. Because the court of appeal has a constitutional function to perform, it has every right to determine whether the trial court verdict was clearly wrong based on the evidence, or clearly without evidentiary support.
[Emphasis supplied].
The manifest error rule applies in appeals of medical malpractice actions. Martin v. East Jefferson Gen. Hosp., 582 So.2d 1272 (La.1991); and also Alello, supra.
The learned trial judge's findings were as follows:
The Court finds from the testimony of the experts that Drs. Guzzetta and Miller did not violate the standard of care in forming a flat stoma on Mrs. Gamino. A physicians conduct should be reasonable under the circumstances existing when his professional judgment is exercised. A physician is not held to a standard of perfection nor evaluated with the benefit of hindsight. After four hours of surgery and with Mrs. Gamino's abdomen being full of adhesions and thickened bowel, the defendants were not negligent for failing to construct a Brook's stoma. They exercised their best surgical judgment, as well as reasonable care, during Mrs. Gamino's surgery.
[Citations omitted].
In accordance with our appellate function, and after reviewing the entire record as a whole, we find no manifest error in the above determinations made by the trial judge and in our opinion, the great preponderance of the testimony and evidence support these conclusions.
While this Court is extremely sympathetic with Mrs. Gamino and her very unfortunate condition, it is clear that she, and especially her abdomen, bowels, intestines, etc. on which the doctors had to work, were in very poor condition when entering surgery. It is readily apparent that construction of the Brook's stoma would have been the ideal method. However, faced with the unusual conditions in plaintiff's intestines described by the doctors and the severe dangers plaintiff would be exposed to, even threatening her life and the very likely postoperative complications that might result by the additional time and complications that would be encountered to construct a Brook's stoma, we agree that it was reasonable and within the standards of care prevailing in this community for the defendant doctors to decide to construct a flat stoma rather than a Brook's stoma. The fact that the Brook's stoma is the preferred method does not, in and of itself, prove the defendants were negligent and the fact that a physician chooses a less common approach or treatment does not infer negligence. Smith v. Gottsegen, 535 So.2d 1330 (La.App. 5 Cir.1988); Soileau v. HCA Health Service of Louisiana, 539 So.2d 662 (La.App. 3 Cir.1989).
Both surgeons testified that this was probably the worst case they had ever seen. The record contains an abundance of preponderating *44 evidence to sustain the conclusion, implicit in the trial court's judgment, that the extremely debilitated state of plaintiff's bowels supported the decision of the surgeons not to risk further endangerment of that organ by attempting to draw up more length, and take more time in surgery, in order to form the Brook's stoma.
Accordingly, we find no manifest error in the trial judge's conclusion that under R.S. 9:2764, the plaintiff failed to prove that defendants care fell below the requisite standard and degree of care ordinarily exercised in this community and that they were not guilty of negligence or malpractice.
In brief, plaintiff urges that there have been several "versions" of the defendants' story, seriously questioning their credibility. We find no such inconsistencies in the record. The depositions and testimony have been consistent to the effect that the decision made by the surgeons was done because they were running out of time to conclude the operation safely, due to the extremely deteriorated and complicated conditions found within plaintiff's abdomen as described above. Our understanding of Dr. Guzzetta's testimony is that he felt, at the time, that it would have been impossible to pull the bowel out further to form the Brook's stoma, but even if it could be done at all, it would have taken at least another forty minutes. We see no internal contradiction here.
Finally, we find that plaintiff has not proven any other instances of substandard care. The instances which plaintiff's expert, Dr. Paul, opined characterized as substandard were either refuted by the actual facts (i.e., in the first surgery the bowel was not resected, so it could not have been malpractice to fail to send a segment to pathology) or by the other witnesses at trial (the physicians who were asked stated that the pre-operative attempts to probe the ileostomy with a catheter was appropriate as an attempt to avoid possibly unnecessary surgery). In addition, the testimony from the witnesses preponderated to the effect that the fistula suffered by plaintiff was a complication of the surgery itself, or of the disease, or possibly of both. Dr. Guzzetta recommended hyperalimentation following surgery, which plaintiff refused but which she ultimately received, and which resolved the problem.
Our conclusion is, then, that while we agree that plaintiff has indeed, suffered a great deal, we find no evidence that she did so as a result of any substandard care on the part of the defendant doctors.
For the foregoing reasons, the judgment appealed from is affirmed. Costs of this appeal are assessed to appellant.
AFFIRMED.