663 So.2d 769 (1995)
Patricia P. GOODLIFFE
v.
PARISH ANESTHESIA ASSOCIATES, Linda Chehardy and Rao Venkateswara Kata, M.D.
No. 95-CA-357.
Court of Appeal of Louisiana, Fifth Circuit.
October 18, 1995.
*771 Susan Northrop Ryan, New Orleans, for Appellants Parish Anesthesia Associates, Linda Chehardy and Rao Venkateswara Kata, M.D.
William B. Hall, Metairie, David W. Oestreicher, II, New Orleans, for Appellee Patricia P. Goodliffe.
Before KLIEBERT, GOTHARD and CANNELLA, JJ.
CANNELLA, Judge.
Defendants, Dr. Rao Kata, Linda Chehardy, CRNA, and Parish Anesthesia Association (Parish), appeal a medical malpractice judgment rendered in favor of plaintiff, Patricia Goodliffe, in the amount of $379,672. We affirm.
Plaintiff was diagnosed with Ascherman's syndrome and entered Lakeside Hospital on June 28, 1988 for an elective hysteroscopy. She was 43 years old, in good health otherwise and was given general anesthesia. She awoke in the recovery room with a dislocated jaw. Plaintiff subsequently began suffering with temporo mandibular joint (TMJ) pain, causing her to file suit against Lakeside Hospital, Parish Anesthesia Associates, Dr. Rao Kata, Dr. Louis Levin, Dr. Carla Urban and certified registered nurse anesthetist (CRNA), Linda Chehardy. Lakeside Hospital and Dr. Urban were voluntarily dismissed in 1991. A judge trial was held on May 9, 11 and 12, 1994. Plaintiff voluntarily dismissed Dr. Levin during the trial. On October 18, 1994, the trial judge rendered judgment with written reasons, in favor of plaintiff against Dr. Kata, Nurse Chehardy and Parish Anesthesia Associates in the amount of $379,672.
On appeal, defendants assert that the trial judge erred in finding that they caused plaintiff's TMJ problems, in applying the legal precepts of Res Ipsa Loquitur and Respondeat *772 Superior, in overruling defendants' objection to the testimony of plaintiff's expert, Dr. Ronald Fischer, in casting Dr. Kata in judgment and that the trial judge abused his discretion in the award of damages.
The record reflects that when plaintiff was brought into surgery, plaintiff was given 3 milligrams (mg.) of Curare, 350 mg. of Sodium Pentothal and 60 mg. of Anectine, a short acting drug. Defendant anesthesiologist, Dr. Kata and defendant nurse anesthetist, Linda Chehardy, intended to anesthetize plaintiff by using a facial mask since the procedure was simple and short. Thus, plaintiff was given Forane, nitrogen and oxygen through the facial mask. However, the mask did not fit, causing leakage of the Forane and Nitrous Oxide, so the doctor and nurse decided to administer the anesthetics by intubation. In order to relax the plaintiff so that the tube could be inserted through her mouth, another dose of Anectine was administered. Nurse Chehardy testified that she then used a blockade monitor to determine whether or not the plaintiff's muscles were relaxed sufficiently to insert the tube. The nurse and doctor testified that the blockade monitor failed to detect any muscle twitch and the intubation procedure continued. Nurse Chehardy performed the procedures, while Dr. Kata supervised her actions, gave permission for the intubation and monitored plaintiff's heart rate. When the tube was in place, the actual surgery commenced and was uneventful. At no time that plaintiff was under anesthesia did she yawn or otherwise use her facial muscles. According to the various witnesses, the general anesthesia made it impossible for her to do so. Rita McMaster, the recovery room nurse, testified that when plaintiff began to awaken in the recovery room, the oral airway inserted in surgery was removed. At that time, plaintiff moaned and tried to get up. Nurse McMaster noticed that the jaw looked unusual. When plaintiff's oxygen mask was subsequently disconnected, plaintiff was able to indicate that her jaw hurt and that she could not close her jaw. Nurse McMaster noted plaintiff's difficulty and called Dr. Louis Levin, the on-call anesthesiologist. Dr. Levin stated that upon arrival, he noted bilateral spasm in plaintiff's jaw muscles and that she could not close her mouth. He concluded that her jaw was dislocated at one or both of the temporo mandibular joints. He tried medication and manipulation to relax the jaw to no avail. Dr. Levin then contacted Dr. Bryce LeBlanc, an ear, nose and throat (ENT) surgeon for consultation. Working together, the doctors tried to manipulate the jaw to relocate the jaw into the proper position. Finally, after an injection of a local anesthetic into the muscles surrounding the TMJ on both sides, the jaw was put back into place. However, it immediately popped back out and had to be manipulated back into position. The doctors then placed a cling wrap around plaintiff's head and jaw to hold the jaw closed. Later that evening, plaintiff underwent an emergency hysterectomy, again requiring general anesthesia. She was again intubated, this time without difficulty, by Dr. Levin. The second surgery was successful and uneventful.
Plaintiff was told about the dislocation of her jaw the next day and at that time was examined by Dr. Daniel Jacob, ENT. Dr. Jacob found that she was mildly tender in the left TMJ and advised a soft diet. She was discharged from the hospital on July 4, 1988, but saw Dr. Jacob again for a follow-up on July 7, 1988. In his report to plaintiff's surgeon, Dr. Eric Schultis, Dr. Jacob stated that plaintiff's jaw had not dislocated again, but she was still tender in the left TMJ. He further stated that she should remain on a soft diet for two weeks and that they would have to "wait to see" whether she would develop TMJ syndrome symptoms. When plaintiff began to suffer jaw pain in the TMJ area and headaches, on September 1, 1988, she went to Dr. John Kent, D.D.S. at the Louisiana State University School of Dentistry. Dr. Kent diagnosed plaintiff with a probable stretch of the posterior ligament. He recommended therapy and drugs to relax her jaw.
In October and November 1988, plaintiff had treatment for periodontal disease. The procedures required four visits since only one-fourth of the mouth at a time could be treated. In one treatment note, the doctor stated that "pt. did fine with her jaw this appt." *773 In November 1988, plaintiff sought another opinion about her TMJ pain, because the drug prescribed by Dr. Kent was too sedating. Plaintiff went to Dr. Michael Kinnebrew, M.D., DDS, a specialist in maxillo-facial surgery. Dr. Kinnebrew treated plaintiff from November 23, 1988 until April 6, 1989. During his treatment, she complained of jaw pain, headaches and ear pain. She also reported that she was gritting her teeth (bruxism). Dr. Kinnebrew found that she had "dyskinetic" (uneven) range of motion and temporal muscle spasm. He noted that plaintiff exhibited popping joint sounds. According to Dr. Kinnebrew, the slope of the front lip of the fossa socket of the TMJ was larger than normal. No specific abnormalities were noted in her X-rays and she was able to open her mouth between 35-42 mm. He stated that 35-45 mm is normal. He prescribed a soft diet, moist heat, muscle relaxants and Maalox for potential heartburn from the medication. On April 6, 1989, in a telephone discussion with plaintiff, he referred her to Dr. Roger Vitter for a possible splint and further conservative treatment. He stated that he did not believe surgery was warranted at that time because the jaw needed time to recover from the dislocation injury.
On April 6, 1989, plaintiff began treatment with Dr. Vitter, D.D.S., a specialist in prosthodontics, which continues to date. Dr. Vitter stated that she informed him that she had been doing reasonably fine until the past week, but since then was suffering from shooting pain in the left ear and bilateral achiness around the ears and that she was unable to open her mouth wide. He noted her jaw made popping noises. He measured her for a mouth splint to manage her symptoms and prescribed medication to reduce the inflammation and reduce her pain. He described the splint as a hard, clear, plastic apparatus that fits over either the lower or upper teeth to position the lower jaw. It relaxes the muscles by removing the fit of the teeth from the picture. She returned in the latter part of April to be fitted with the splint to be worn for 24 hours a day. She was seen again by Dr. Vitter in May and June, at which time she was able to remove the splint for eating, but noticed a return of the pain when she did so. In his examination of plaintiff in July, the doctor noted that she still had headaches, popping noises and bilateral pain in the ear. In order to wean her from the splint, she was told to wear the splint only at night and return in three months. Plaintiff returned to Dr. Vitter's office in November and was exhibiting the same symptoms. At this time he diagnosed her condition as internal derangement or meniscus displacement. He explained in his testimony that this condition involves the pad, or disc, that rides between, or cushions, the ball and socket in the jaw joint. He also testified that he cannot be sure that the disc is involved, without an arthrogram, computed tomography (CT) scan or magnetic resonance imaging (MRI). However, he said that he did not order these tests because the treatment is the same. He said that the condition requires cautionary eating to prevent problems and that the condition can also cause the muscles in the area to become protective by guarding or bracing. He noted that changes in the barometer affects the pain level. Dr. Vitter told her to wear the splint according to need and prescribed anti-inflammatory medications. However, the doctor stated plaintiff has not responded to the conservative measures; thus, he recommends that she have arthoscopic surgery. He referred her to Dr. James Quinn for the surgery, but stated he would treat her post-operatively until the joint stabilizes and her bite can be corrected. Dr. Vitter stated that the surgery may not correct the problem. He also stated that plaintiff will have to wear a splint full-time for six months following the surgery.
Dr. Quinn, an oral maxillary facial surgeon, testified that he operated on plaintiff in 1966 for impacted wisdom teeth. Before plaintiff saw Dr. Quinn at the recommendation of Dr. Vitter, she was seen by him in 1992 at the request of defendants. Dr. Quinn stated that plaintiff was afraid to open her mouth wide when he saw her in 1992 and was suffering from headaches. She was only able to open to 25mm, which was below normal. He stated that the problems may be masking old hyper-mobility difficulties, which is when the jaw joints are too loose. He said that 25% of *774 patients with TMJ syndrome develop arthritis in the joint. Dr. Quinn testified that when plaintiff returned to see him two years later as a private patient, she still had pain and problems with joint dysfunction. He noted that she was using a splint and eating a soft diet. Dr. Quinn stated that arthoscope was warranted to find out what was going on in the joint and correct it if possible. He testified that he would like a MRI before surgery, but even without one, the arthoscope procedure was appropriate considering plaintiff's symptoms. He stated that his fee for the procedure would be $5000 and that the hospital would cost approximately $5500. However, he did not know the anesthesiology fee or the cost for rebuilding her mouth and post-operative splint therapy. He stated that he had scheduled the surgery. On cross-examination, Dr. Quinn acknowledged that plaintiff had suffered muscle spasm on the left of her jaw in 1966 and that chewing on one side and clenching the teeth can cause pain and joint problems over time. He testified that the surgery is necessary to determine the source of the pain and that if the problem is hyper-mobility, he can tighten the joints so the problem would not get better without surgery. He said that disc problems sometimes do get better and that 90% of TMJ dysfunctions are suffered by women due to either loose joints of clenching caused by stress. He noted that the loose joints cause the mouth to open too wide, stretching the jaw too far forward and that dislocation can result from a yawn. He testified that a bad bite may add to the problem, but not cause it and prolonged dental work can cause problems with stretching of the joints. He did not agree with the defense that the slope of the front lip of the fossa socket of the TMJ would cause TMJ problems, but did not disagree that it might allow the joint to dislocate easier. Dr. Quinn testified that the slope was actually within normal range.

CAUSATION
Defendants first argue that plaintiff failed to prove by a preponderance of the evidence that they did anything to cause the TMJ syndrome. Defendants contend that the trial judge erred in his factual findings because, contrary to the trial judge's findings, the evidence showed that the problem could have been caused by the plaintiff's predisposition to subluxation, based on her history, that the jaw could have spontaneously dislocated and that the jaw was adequately relaxed for intubation.
Plaintiff asserts that the evidence shows that she was not predisposed to subluxation, that some act on the part of plaintiff was required for spontaneous dislocation and that there was no evidence that the plaintiff yawned or otherwise moved her jaw to cause spontaneous dislocation. Plaintiff also argues that the evidence as to whether plaintiff was adequately relaxed was conflicting and that under the appellate court standard of review, this court must give great weight to the trial court's reasonable evaluations of credibility and reasonable inferences of fact.
In reviewing findings of fact made by the trier of fact, the courts of appeal may not set aside those factual findings in the absence of manifest error, or that the findings are clearly wrong. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099, 93-3110, 93-3112 (La. 7/5/94), 639 So.2d 216, 220. The manifest error rule applies in appeals of medical malpractice actions. Martin v. East Jefferson Gen. Hosp., 582 So.2d 1272, 1276 (La.1991); Gamino v. Lakeside Hosp., 94-727, (La.App. 5 Cir. 2/15/95); 652 So.2d 36, 42. Causation in medical malpractice cases is subject to the manifest error standard of review. Martin at 1274; Gamino at 42-43.
In Ambrose, the Supreme Court explained:
In Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), this Court held that the court of appeal should not upset the factual findings of a trial court absent manifest error or unless clearly wrong. A proper review, therefore, cannot be "completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court; there must be a further determination that the record established that the finding is not clearly wrong." Id. at 1333. More recently, regarding this constitutional appellate review of fact in civil cases, La. Const. art. 5, Sec. 10, we have had occasion to say in Youn v. *775 Maritime Overseas Corp., 623 So.2d 1257 (La.1993), a case which involved the review of damages, that "the discretion vested in the trier of fact is `great,' and even vast," and in Stobart v. State, 617 So.2d 880, 882-83 (La.1993), which involved the standard of review of findings of fact, a "court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong,'" and "where two permissible views of the evidence exists, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Id. In each of these cases there was but a perpetuation of the principle set down in Arceneaux.

Notwithstanding the Court's earlier guidance to reviewing courts in Stobart v. State through DOTD, 617 So.2d 880 (La. 1993), it was not our purpose in that case to mandate that the trial court's factual determinations cannot ever, or hardly ever, be upset. Although deference to the factfinder should be accorded, the court of appeal, and the Louisiana Supreme Court, nonetheless have a constitutional duty to review facts. [Louisiana Constitution of 1974, article 5, Sec. 5© and 10(D)] Of course, the reviewing court may not merely decide if it would have found the facts of the case differently. Rather, notwithstanding the belief that they might have decided it differently, the court of appeal should affirm the trial court where the latter's judgment is not clearly wrong or manifestly erroneous. Because the court of appeal has a constitutional function to perform, it has every right to determine whether the trial court verdict was clearly wrong based on the evidence, or clearly without evidentiary support.

a) Predisposition to Subluxation
Defendant recites plaintiff's medical history to show that she was predisposed to subluxation, as follows: (1) that she had been seen by two periodontist, five dentists and one oral and maxillofacial surgeon; (2) that plaintiff had a history of myalgia and left masseter muscle spasm following removal of her impacted wisdom teeth; (3) that she had a history of masticating primarily on the left side, which can cause clenching of the teeth and produce muscle spasm and joint problems; (4) that she suffered with complaints of breathing problems, which can cause TMJ disorder; (5) that plaintiff was treated by a general practitioner for complaints of pain in the TMJ area; and (6) as of 1988, she had undergone extensive general restorative dentistry and had a permanent bridge which was 20-30 years old.
In testimony, plaintiff denied any problems in the TMJ area or subluxation or dislocation prior to the incident in the hospital. She had impacted wisdom teeth surgery in 1966 by Dr. Quinn, with one noted episode of muscle spasm during the same period. She underwent periodontal work in 1989, which increased her mandibular stiffness, according to the history she gave to Dr. Kinnebrew. In 1971, plaintiff underwent a septorhinoplasty to relieve nasal airway obstructions and for cosmetic reasons. In May 1988, plaintiff had an emergency D & C, in which she may or may not have received a chipped tooth as a result of the anesthesiology. The evidence is unclear as to how the chip occurred. Although defendants rely on the testimony of Dr. Quinn to support their assertions that she habitually chewed on the left side, which could cause TMJ, in Dr. Quinn's review of her history, he found no relation to the dislocation, although he said that this could cause muscle spasm. Dr. Quinn was ambivalent about the effect of her airway problems, slope of the front lip of the fossa socket of the TMJ and periodontal history causing a predisposition to TMJ problems, because the research was inconclusive. Yet, he noted that long periods in the dental chair could stretch the joint area. Dr. Kinnebrew's testimony was similar. However, both Drs. Quinn and Kinnebrew stated that they relied on the history as given on the issue of how the dislocation occurred. In addition, Dr. Vitter, with formal training in the management of TMJ disorders, testified that plaintiff's history was unremarkable and nothing in the record indicated a predisposition to or prior TMJ problems or subluxation or dislocation.
We first note that dislocation and subluxation are not interchangeable terms. According *776 to the medical testimony, subluxation occurs when the joints pop in and out of place, but when the jaw dislocates, it remains out of position. After reviewing the testimony and medical records, the trial judge concluded that there was no proof that plaintiff was predisposed to subluxation or dislocation. Dr. Quinn's testimony was relied on by defendants to show predisposition to subluxation from other causes. However, his testimony in this regard was very speculative, whereas Dr. Vitter, the treating specialist in TMJ, specifically asserted that the medical history did not predispose plaintiff to dislocation or TMJ disorders. In addition, Dr. Ronald Fischer, plaintiff's expert anesthesiologist, reviewed the medical records and concluded likewise. Thus, we find no manifest error in the trial judge's findings that the evidence shows that there was no predisposition here that would account for the dislocation that occurred to plaintiff in this instance.

b) Spontaneous Subluxation
In regard to defendants' argument that the cause of the TMJ could have been spontaneous subluxation in or right after surgery, the evidence was clear that subluxation can occur spontaneously. Plaintiff does not deny this fact. However, as testified by Dr. Vitter, there must be some action by the patient to cause the jaw to go out of position. Dr. Fischer agreed. In this respect, the medical testimony of Dr. Kata and Nurse Chehardy showed that plaintiff never yawned or made any facial motions while in surgery. Because she was under anesthesia, Dr. Kata stated that it was impossible for her to do so. Plaintiff was brought to recovery in a deep sleep with a tube in her mouth. While there, she was watched carefully for signs of waking up and the recovery room nurse did not notice any facial motions. When the tube was removed, Nurse McMasters noticed the unusual position of plaintiff's jaw. When plaintiff began to wake up, it was discovered that she could not close the jaw. We are in agreement with the trial judge that the preponderance of the evidence shows that the dislocation was not spontaneous. Thus, we find no manifest error in this finding.

c) Adequate Relaxation Prior to Intubation
Next, defendants assert that the trial judge erred in finding that they deviated from the applicable standard of care employed in the field of anesthesiology because plaintiff was not adequately relaxed prior to intubation. They contend that the amount of medications given plaintiff met the standards in the literature relied on by plaintiff's expert in anesthesiology, Dr. Ronald Fischer and defendants' expert, Dr. Glen Casey, as well as by other anesthesiologists working in the field. They also complain that they were forced to depose Dr. Fischer in Rhode Island for purposes of trial immediately following his deposition for discovery, without an opportunity to consult with their expert, thereby prejudicing their ability to cross-examine him.
The testimony reflected that plaintiff was given 3 mg of Curare, 350 mg of Sodium Pentothal and 60 mg of Anectine, a short acting drug, in preparation for surgery. Dr. Kata and Nurse Chehardy then attempted to anesthetize plaintiff by using a facial mask, through which Forane, nitrogen and oxygen were administered to complete the anesthetization. However, the mask did not fit and the Forane and nitrous oxide leaked from the mask, making the integrity of the anesthetics suspect. Thus, with Dr. Kata's permission, it was decided to administer the anesthetics by intubation. Before beginning the intubation, it was necessary to relax plaintiff's mouth so that the tube could be inserted. To this end, Nurse Chehardy administered another dose of the short-acting drug, Anectine. Following this, she used a blockade monitor to determine whether or not plaintiff's muscles were relaxed sufficiently to insert the tube. Dr. Kata and Nurse Chehardy testified that the blockade monitor is the "gold standard" for determining proper relaxation of the patient for intubation. It works by attempting to stimulate a reaction in the nerves near the eye. If the monitor fails to detect a twitch of the nerves, then the patient is considered relaxed sufficiently for intubation. The doctor and nurse stated that plaintiff's nerves failed to register a twitch, so the intubation proceeded. The *777 two defendants also stated that plaintiff's mouth was not resistant and that the intubation was easy. In addition, Nurse Chehardy stated that she would have noticed if the jaw had dislocated because, as in all cases, she kept a hand around the plaintiff's mouth through the surgery. Both denied that plaintiff's jaw became dislocated during the surgery.
Dr. Fischer reviewed all of plaintiff's medical records, including those from the surgery. He also reviewed the applicable literature. He testified in his video deposition that the anesthetic care was below standard. Dr. Fischer based his conclusion on the fact that plaintiff was given only 60 mg. of Anectine, when she was also given 3 mg. of Curare. He explained that Curare is administered with Anectine to offset Anectine's effect of causing muscle shakes. However, he testified that Curare also reduces the anesthetic effect of Anectine. Thus, when Curare is given, the dosage for Anectine must be increased, which was not done in this case. Otherwise, the proper level of relaxation will not be achieved. He further testified that the fact that the dislocation occurred on only one side of plaintiff's jaw indicated that the dislocation was from trauma. Although he agreed that dislocation can occur without excessive force, Dr. Fischer found it noteworthy that this dislocation was so severe that two doctors could not put it back in place without assistance from a intravenous sedative and local anesthetic. In his opinion, the dislocation had to have occurred during administration of anesthesia and the severity indicated that force was used in the scissoring method used to open plaintiff's mouth.
Dr. Casey, Chairman of the Anesthesiology Department at Baptist Hospital in New Orleans, served on the medical malpractice panel that found in favor of defendants in this case. He testified for defendants. He stated that he did not review plaintiff's medical records, but nevertheless disagreed with Dr. Fischer. Dr. Casey explained that the amount of Anectine that should be administered varies with the patient's weight. He stated that the Forane administered through the mask was sufficient to relax plaintiff for intubation. He also noted that the amount of Anectine administered met the standards recommended by the textbooks relied on by Dr. Fischer. In addition, Dr. Casey stated that it is easier to dislocate a patient's jaw by over relaxing, rather than under relaxing because if the jaw is not sufficiently relaxed, it is difficult to open.
The trial judge reviewed the evidence and considered the conflicting testimony of Dr. Fischer and Dr. Casey. He determined that the dislocation resulted from the actions of the anesthesia team, Dr. Kata and Nurse Chehardy and that their actions fell below the applicable standard of care. In reviewing those findings, we conclude that the trial judge was not clearly wrong.

ADMISSIBILITY OF THE TESTIMONY OF DR. FISCHER
Defendants complain that Dr. Fischer was incompetent to testify because he was not in surgery, did not have the benefit of Nurse Chehardy's trial testimony and admitted not being competent to testify to causation, diagnosis and treatment of TMJ syndrome and disease.
The record reflects that Dr. Fischer is eminently qualified to testify as to the standard of care in anesthesiology. The focus of this dispute was whether or not the anesthesiology team committed malpractice. Dr. Fischer is a board certified anesthesiologist and is Chairman of the Anesthesiology Department at Rhode Island Memorial Hospital. He has testified on more than one occasion as an expert in his field, specifically with regard to the subluxation of the jaw. In addition, Dr. Fischer interviewed plaintiff on two occasions and reviewed the available medical records. Contrary to defendants' claims, he stated that he relied on that documentation as the underlying basis for his opinion. We find that Dr. Fischer was qualified to testify on behalf of plaintiff.
Defendants also contend that either Dr. Fischer's testimony should have been excluded or they should have been allowed to introduce the discovery deposition because they were prejudiced by being forced to question Dr. Fischer in his deposition for trial immediately following his deposition for discovery. They claim that they did not have *778 the benefit of their expert's opinion at that time to adequately cross-examine Dr. Fischer. However, the record reflects that defendants and their experts had adequate opportunity to consider Dr. Fischer's trial deposition prior to trial and they attempted to rebut those assertions at the trial. Defendants' expert, Dr. Casey, along with the defendant Dr. Kata and Nurse Chehardy, testified in opposition to his conclusions. Thus, we find that defendants were not prejudiced by the deposition testimony of Dr. Fischer and that the introduction of Dr. Fischer's discovery deposition was not warranted. Thus, we find that the trial judge did not err in excluding the discovery deposition and in allowing the trial deposition to be introduced.

LIABILITY OF DR. KATA
Defendants next assert that the trial judge erred in finding Dr. Kata liable. They contend that Nurse Chehardy was solely responsible for intubating and extubating plaintiff and Dr. Kata neither participated in nor had control over her actions.
The record reflects that Dr. Kata participated in the procedures leading up to and including the intubation. He supervised, checked vital signs and gave Nurse Chehardy permission to intubate when they both noted that the mask induced anesthesia was leaking. His testimony showed that he was an active participant, not just a passive observer of Nurse Chehardy's actions. The monitoring of vital signs was directly related to the intubation and the insufficient administration of anesthesia because it indicated the level of her relaxation. The cases cited by defendants are inapplicable.[1] Thus, we find that the trial judge did not err in finding Dr. Kata liable.

LEGAL ERROR

a) Res Ipsa Loquitur
Defendants contend that the trial judge erred legally in applying Res Ipsa Loquitur to determine that defendants were negligent. They contend that plaintiff's theory of the case was that she went into Lakeside Hospital for care and treatment of gynecological dysfunction and left with a dislocated jaw, which cannot occur in the absence of negligence. However, defendants contend that the experts stated that the spontaneous subluxation can occur and that yawning can cause subluxation.
We have already determined that the trial judge was not clearly wrong in concluding that plaintiff's injuries were a result of the actions of defendant which were below the applicable standard of care. Under the particular facts of this case, it was shown that plaintiff never moved in any manner which could have caused spontaneous subluxation or the severe dislocation that occurred here. As long as the fact-finder can reasonably conclude that plaintiff's injuries were, more probably than not, caused by defendant's negligence under the particular facts of a case, the doctrine of res ipsa loquitur applies. Cangelosi v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654, 664 (La.1989). However, regardless of the applicability of this legal doctrine, the evidence showed by a preponderance that the dislocation occurred through the actions of defendants that fell below the standard of care. Thus, we find that the trial judge did not err in applying res ipsa loquitur.

b) Respondeat Superior-Liability of Parish Anesthesia Associates
Defendants next contend that the trial judge erred in casting both Linda Chehardy and her employer, Parish, liable in solido. They argue that without any independent act of negligence, the limitation of liability set forth in La.R.S. 40:1299.42.B(2) would apply to the two together and that each of the two defendants are not liable for a separate $100,000.
Plaintiff argues that Parish is independently liable, not merely as the result of Nurse Chehardy's acts, but because of its own negligence. She contends that, as an employer, Parish failed to properly attend to the needs *779 of the patient. Plaintiff asserts that Parish undertook the responsibility to train and prepare Nurse Chehardy in the administration of anesthesia, upon which plaintiff relied. Thus, as a result of its own negligence in training Nurse Chehardy, it deviated from the standard of care.
The judgment is unclear as to whether Parish was held liable individually for its own separate $100,000 or as the party covering Nurse Chehardy's $100,000. Nevertheless, we agree that any separate liability of Parish for a separate limit of liability must be predicated on its own negligence, which was not shown in this case. The record and transcript are totally devoid of any evidence relating to the relationship of Nurse Chehardy to Parish, upon which to base a finding of its individual liability. The evidence only shows that she was employed by Parish and Parish covered her for her $100,000 maximum liability for malpractice. We cannot presume that Parish trained or otherwise instructed Nurse Chehardy in anesthetic procedures. Thus, Parish Anesthesia Associates cannot be held individually liable for malpractice to plaintiff. It is, however, responsible for payment of Nurse Chehardy's $100,000. Plaintiff must look to the Louisiana Patient's Compensation Fund to recover any amounts over and above the $200,000 attributable to Dr. Kata and Nurse Chehardy's limitations of liability.

AWARD OF DAMAGES

a) Limitation of Liability
Defendant asserts that the trial judge abused his discretion in the amount of the damages he awarded. Defendants argue that under R.S. 40:1299.42B(2), they cannot be liable for more than the single $100,000 limit of liability. They assert that Nurse Chehardy is the only defendant that can be held liable based on their previous arguments.
LA R.S. 40:1299.42, Limitation of recovery, provides as follows:
B. (1) The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and cost.
(2) A health care provider qualified under this Part is not liable for an amount in excess of one hundred thousand dollars plus interest thereon accruing after April 1, 1991, for all malpractice claims because of injuries to or death of any one patient.
This provision limits each health care provider's liability for compensation to $100,000. It does not limit the judgment to $100,000. Each individual health care provider, in this case, Dr. Kata and Nurse Chehardy, is liable for a maximum of $100,000. Any excess amounts between each defendant's $100,000 and $500,000 are paid by the Patient's Compensation Fund. Since we have already held that each of the two defendants is liable based on his or her own negligence, we find no merit to this argument.

b) Excessiveness of the award

1. Medical Expenses;
Defendants assert that the award is excessive. They contend that the past medical expenses were not documented. Defendants contend that plaintiff only introduced $1,667 in documented past medical expenses. Defendant also contends that plaintiff's evidence is speculative in regard to future surgery, but even so, she only proved $5,000 for Dr. Quinn's bill, not $28,000. Defendants also contend that the general damage award is excessive based on the evidence, citing other cases for comparison.
The trier of fact has great discretion in awarding damages. In reviewing an award of damages, the role of the appellate court is to review the exercise of that discretion. Youn v. Maritime Overseas, 623 So.2d 1257, 1260 (La.1993); Reck v. Stevens, 373 So.2d 498 (La.1979). Only when the court finds, under the particular circumstances of the case, that the trier of fact abused his discretion, may the appellate court modify the award. Id.
In this case, plaintiff testified that she incurred $3200 in medical expenses up to the date of trial. She produced documentation on $2400 of those bills. Plaintiff stated that she intended to have the arthroscopy and Dr. *780 Quinn testified that the surgery had been scheduled. The surgery was estimated by Dr. Quinn to cost $5000 for his fee and $5500 for the hospital. He did not know how much the other charges would be for anesthesia, etc. Dr. Quinn and Dr. Vitter noted that plaintiff will require follow-up treatment and a new splint, which she will wear for 24 hours a day for several weeks. Plaintiff estimated the total cost to be $28,000. The trial judge awarded $29,672. After reviewing the evidence, we find no abuse of the trial judge's discretion in the award of medical expenses.

2. General Damages
The evidence of general damages shows that plaintiff has a lifetime disability. She has suffered and will continue to suffer unrelenting pain, relieved in part by the wearing of a plastic apparatus at least one-third of each 24 hour period and by medications, some of which make her sleepy. She will have to wear another splint following surgery for the full 24 hours for several weeks. She will continue to require monitoring of the TMJ, faces the possibility of arthritis in the joints and must stick to a soft diet. Her family testified that she is in pain, that she clenches her teeth, her speech is different and stiff, and the left side of her face is sometimes puffy. These difficulties make it hard for her to deal with daily functions, enjoy her child or to babysit the neighbors children, as she did previously. In addition, she is guarded in her mouth movements, such as yawning and her pain level gets worse with barometric changes.
After reviewing the testimony, the trial court concluded that plaintiff suffered general damages in the amount of $300,000 for pain and suffering and past, present and future mental anguish in the amount of $50,000. Under the particular facts of this case, we find that the trial judge did not abuse his discretion in the award of general damages.

3. Plaintiff's Contributory Negligence:
Defendants assert that plaintiff was contributorily negligent because she failed to indicate on her pre-anesthesia questionnaire her extensive dental history and prior anesthesia complication (chipped tooth). However, the evidence shows that her prior history was unremarkable and did not show a predisposition to dislocation, as we have already found. Furthermore, there is no evidence that the chipped tooth plaintiff received in a prior hospitalization was related to or caused by the anesthesiology procedure. Therefore, we find that the trial judge did not err in failing to find plaintiff contributorily negligent.
Accordingly, the judgment of the trial judge is hereby affirmed as to damages. The liability determination is affirmed, with the proviso that Parish is liable solely as the provider of Nurse Chehardy's $100,000 malpractice coverage. The judgment is affirmed in all other respects.
Costs of this appeal are to be paid by defendants.
AFFIRMED.
NOTES
[1] Grant v. Touro Infirmary, 254 La. 204, 223 So.2d 148, 154 (La.1969); Parker v. St. Paul Fire and Marine Insurance Company, 335 So.2d 725 (La.1976); Pierre v. Lallie Kemp Charity Hospital, 515 So.2d 614 (La.App. 1st 1987), writ denied, 515 So.2d 1111 (La.1987); Parmelee v. Kline, 579 So.2d 1008 (La.App. 5th Cir.1991); Otnott v. Morgan, 636 So.2d 957 (La.App.4th Cir.1994).