691 So.2d 786 (1997)
Anna L. HOOT, et al.
v.
WOMAN'S HOSPITAL FOUNDATION, et al.
No. 96 CA 1136.
Court of Appeal of Louisiana, First Circuit.
March 27, 1997.
Rehearing Denied April 25, 1997.
*787 Michael C. Palmintier, Baton Rouge, for Plaintiffs/Appellants, Anna L. Hoot, et al.
Daniel A. Reed, Baton Rouge, for Defendant/Appellee, Dr. Guillermo E. Delgado.
Mary H. Thompson, Baton Rouge, for Defendant/Appellee, Woman's Hospital Foundation.
Before CARTER, LeBLANC and PARRO, JJ.
CARTER, Judge.
This appeal arises out of a trial court judgment on a jury verdict in a suit for medical malpractice.

FACTUAL BACKGROUND
In May, 1985, Anna L. Hoot was unwed and pregnant. Ms. Hoot contacted the Baton Rouge Diocese Catholic Community Services, which directed her to programs that provided medical care, including the services of Guillermo E. Delgado, M.D., a Baton Rouge obstetrician.
In July, 1985, at her twenty-sixth week of pregnancy, Ms. Hoot became a patient of Dr. Delgado. Ms. Hoot's pregnancy was relatively uneventful until September of 1985, when she began having contractions. Ms. Hoot was admitted to Woman's Hospital on the evenings of September 28, 29, and 30, 1985. On each occasion, Ms. Hoot was released with a diagnosis of abdominal pain/ false labor.
On October 1, 1985, Dr. Delgado examined Ms. Hoot in his office. Dr. Delgado's examination revealed a thinning and dilation of Ms. Hoot's cervix. As a result, Dr. Delgado referred Ms. Hoot to Woman's Hospital. While confined at Woman's Hospital, Ms. Hoot was placed on Pitocin, a medication which stimulates contractions of the uterus. At this time, Ms. Hoot was in her thirty-sixth week of pregnancy. At approximately 7:59 p.m. on October 2, 1985, Ms. Hoot gave birth to an almost six-pound son, Dustin Hoot.
Following his birth, Dustin's APGAR scores were very high. After a short stay in the nursery, Dustin developed a condition known as Respiratory Distress Syndrome (RDS) and was transferred to the neonatal intensive care unit (NICU). While in NICU, Dustin's condition worsened, requiring him to be placed on a ventilator. Doctors managed the RDS successfully, but Dustin developed complications, including an infection which led to a reduction in his blood platelet count. Dustin suffered a cerebral hemorrhage, resulting in multiple disabilities, including blindness, cerebral palsy, diabetes insipidus, and severe mental retardation. Dustin remained hospitalized until his discharge on January 9, 1986. Shortly after his second birthday, Dustin died.
Ms. Hoot subsequently filed a complaint against Woman's Hospital Foundation (Woman's Hospital) and Dr. Delgado for their alleged medical malpractice and requested review by a medical review panel. On January 30, 1989, the three-member medical review panel unanimously concluded that the evidence submitted did not support the conclusion that Woman's Hospital and Dr. Delgado failed to meet the applicable standard of care as charged in the complaint. The panel also determined that Dr. Delgado's conduct was not a factor in the resultant damages.
*788 On March 30, 1989, Ms. Hoot, individually and as administratrix of the estate of the minor child, Dustin, filed a suit for medical malpractice against Woman's Hospital,[1] Dr. Delgado, and the medical malpractice insurers of both health care providers. In her petition, Ms. Hoot alleged that, as a result of the defendants' conduct prior to, during, and following the birthing process, the child sustained severe, debilitating, and fatal injuries. In amended petitions, Ms. Hoot alleged that Dr. Delgado chemically induced her delivery of Dustin and that, as a result, Dustin was born prematurely. Ms. Hoot also particularized the acts of Dr. Delgado's alleged negligence.
In response, Dr. Delgado filed an answer, denying the allegations of Hoot's petition and averring that, throughout his treatment of Ms. Hoot, he possessed and exercised every professional skill, care, and attention of which he was capable by his education, training, and experience. Moreover, Dr. Delgado claimed that his actions were reasonable and conformed to the customs, procedures, and practices of other physicians in the field of obstetrics and gynecology. Dr. Delgado's answers to the amended petitions alternatively averred that Ms. Hoot's smoking during her pregnancy, against her physician's advice, greatly enhanced the risks to Dustin and that the complications suffered by Dustin were caused by the actions of third persons for whom Dr. Delgado was not liable.
The matter proceeded to a trial by jury. On December 1, 1994, the jury returned the following verdict:
1. Do you find that DR. GUILLERMO DELGADO
 fell below the standard of care required of him in
 this case?
 YES X NO ___
2. Do you find DR. GUILLERMO DELGADO'S failure
 to meet the standard of care caused the
 injuries and death of Dustin Hoot?
 YES ___ NO X 
3. Please state the total amount of damages expressed
 in dollars sustained by Dustin Hoot:
 a. Medical expenses: $______
 b. Physical pain and suffering $______
 c. Mental anguish and distress $______
4. Please state the total amount of damages expressed
 in dollars sustained by Anna Hoot:
 a. Loss of love, affection and companionship $______
 b. Grief and anguish $______
 c. Funeral expenses $______
 Baton Rouge, Louisiana, this 1st day of
December, 1994.
s/ Christy Odendahl
JURY FOREMAN
On December 8, 1994, the trial court rendered judgment in accordance with the jury's verdict in favor of Dr. Delgado, dismissing, with prejudice, Ms. Hoot's claims, individually and as administratrix of Dustin's estate. Ms. Hoot was cast with all court costs, including expert witness fees.
On December 19, 1994, Ms. Hoot filed motions for judgment notwithstanding the verdict (JNOV) and, alternatively, for a new trial. By judgment, dated December 5, 1995, Ms. Hoot's motions were denied.
Ms. Hoot filed a motion for appeal from the December 8, 1994, and December 5, 1995, judgments. In her appeal, Ms. Hoot assigned the following errors:
1. The jury erred in having found that the defendant's failure to meet an acceptable standard of care did not cause the losses sued on in the appellant's case.
2. The trial court erred in having denied the plaintiff's motions for Judgment Notwithstanding the Verdict or for New Trial.[2]

*789 CAUSATION

Ms. Hoot contends that the jury erred in its determination that the breach of the standard of care by Dr. Delgado was not a cause of the injury or death of Dustin.[3]
Pursuant to LSA-R.S. 9:2794 A, to prevail in a medical malpractice action, a plaintiff must prove by a preponderance of the evidence:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
Elaborating on this statute, the Louisiana Supreme Court, in Martin v. East Jefferson General Hospital, 582 So.2d 1272, 1276 (La.1991), stated:
In a medical malpractice action against a physician, the plaintiff carries a two-fold burden of proof. The plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained.
In other words, in suits alleging medical malpractice, the plaintiff must prove the applicable standard of care, the breach of that standard, and that the substandard care caused an injury that the plaintiff otherwise would not have suffered. LSA-R.S. 9:2794 A; Byrd v. State, Department of Public Safety and Corrections, 93-2765, p. 15 (La.5/23/94); 637 So.2d 114, 122; Donaldson v. Sanders, 94-1366, p. 5 (La.App. 3rd Cir. 7/19/95); 661 So.2d 1010, 1014, writ granted, 95-2940 (La.2/28/96); 668 So.2d 363; Gordon v. Willis Knighton Medical Center, 27,044 (La.App. 2nd Cir. 6/21/95); 661 So.2d 991, 997, writs denied, 95-2776, 95-2783 (La.1/26/96); 666 So.2d 679. The plaintiff need not show that the doctor's conduct was the only cause of harm, nor must all other possibilities be negated, but the plaintiff must show by a preponderance of the evidence that she suffered injury because of the doctor's conduct. Clark v. Baton Rouge General Medical Center, 94-2239, p. 11 (La. App. 1st Cir. 6/23/95); 657 So.2d 741, 748, writs denied, 95-1911, 95-1794 (La.10/27/95); 661 So.2d 1347,1352. The test for determining the causal connection is whether the plaintiff proved through medical testimony that it is more probable than not that the injuries were caused by the substandard care. See Donaldson v. Sanders, 661 So.2d at 1018.
The issue of causation in medical malpractice cases is subject to the manifest error standard of review. Seal v. Bogalusa Community Medical Center, 94-1363, p. 5 (La.App. 1st Cir. 11/9/95); 665 So.2d 52, 54; Goodliffe v. Parish Anesthesia Associates, 95-357, pp. 8-9 (La.App. 5th Cir. 10/18/95); 663 So.2d 769, 774, writ denied, 95-2780 (La.2/16/96); 667 So.2d 1051; Seagers v. Pailet, 95-52, p. 10 (La.App. 5th Cir. 5/10/95); 656 So.2d 700, 708. In a medical malpractice case, the reviewing court must give great deference to the jury's findings when medical experts express different views, judgments, and opinions on whether the breach of the standard of care caused plaintiff's damages; such expert opinions are necessary sources of proof whose views are persuasive, although not controlling, and any weight assigned to their testimony by the jury is dependent upon the expert's qualifications and experience. Davis v. Sonnier, 96-515, p. 9 (La. *790 App. 3rd Cir. 11/6/96); 682 So.2d 910, 918-19. See Seagers v. Pailet, 656 So.2d at 708. It is the jury's duty to assess the testimony and credibility of all the witnesses and to make factual determinations regarding these evaluations. Davis v. Sonnier, 682 So.2d at 918. See Seagers v. Pailet, 656 So.2d at 708.
In reviewing findings made by the trier of fact, the courts of appeal may not set aside those factual findings unless the findings are manifestly erroneous or clearly wrong. Goodliffe v. Parish Anesthesia Associates, 663 So.2d at 774. As an appellate court, we may not substitute our judgment for that of the trier of fact, even if we believe that our evaluations and inferences are more reasonable. If the record, when read in its entirety, supports the fact-finder's conclusions and those conclusions are reasonable, an appellate court cannot reverse or modify the trial court's judgment which is based on those factual conclusions. An appellate court can only reverse a fact-finder's determinations when (1) it finds from the record that a reasonable factual basis does not exist for the findings of the trial court and (2) it further determines that the record establishes that the findings are manifestly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La. 1993).
In the instant case, the jury determined that Dr. Delgado breached the standard of care, but that this breach was not the cause of Dustin's injuries or death. The evidence regarding causation was based primarily upon the testimony of Dr. Lawrence R. Neblett, Jr., and the deposition testimony of Dr. Nancy E. Chaney Wight.
The testimony of Dr. Neblett, an expert in obstetrics and gynecology, was based upon his review of the delivery records, postnatal records, and deposition testimony. Dr. Neblett testified that Dustin was born prematurely in that, at the time of his birth, Dustin's gestational age was only thirty-six (36) weeks, four (4) days. Dr. Neblett noted that babies born at gestational ages between twenty (20) and thirty-seven (37) weeks are premature and likely to develop RSD due to the insufficiency of surfactant, a material which enables the lungs to expand. Dr. Neblett also testified that RSD occurs in approximately 20% of all babies born before thirtyseven (37) weeks. Moreover, premature babies are more susceptible to infection.
According to Dr. Neblett, shortly after birth, Dustin encountered difficulty breathing, which was revealed in the blue discoloration of his face and skin. Dustin was then treated by a neonatalogist who placed Dustin on a ventilator for several days because the child was unable to oxygenate properly. Dr. Neblett testified that, on the twelfth day, Dustin deteriorated more markedly and later suffered from a brain hemorrhage. Dustin also developed sepsis, which is an infection in the blood. Dr. Neblett further noted that Dustin also suffered from seizures and developed diabetes insipidus.
With regard to the issue of causation, Dr. Neblett opined that Dustin's premature delivery gave rise to his physical ailments, including RDS, susceptibility to infection, brain hemorrhage, and jaundice. However, because Dr. Neblett does not treat children in his practice as an obstetrician/gynecologist, Dr. Neblett testified that he would defer to a neonatalogist or pediatrician on the issue of the sequela of RDS.
Dr. Wight, a neonatalogist, testified that neonatalogy is a subspecialty of pediatrics and deals with the intensive care of sick or premature infants. Dr. Wight stated that a pre-term infant is one whose gestational age is less than thirty-seven (37) weeks. Babies whose gestational age is between thirty-seven (37) and forty-two (42) weeks are referred to as term babies, and post-term babies are those whose gestational age exceeds fortytwo (42) weeks.
Dr. Wight testified that she became involved with the treatment of Dustin on the day of his birth. Her initial assessment revealed that Dustin's birth weight was 5 ¾ pounds, which was appropriate for his gestational age of thirty-six (36) weeks. Dr. Wight noted that Dustin's APGAR scores of 9.9 were very high, showing good transition from fetus to newborn baby. According to Dr. Wight, Dustin was close to term. Dustin was admitted to the neonatal nursery because he had RDS. Dr. Wight correlated *791 chances of survival of a large infant with RDS with the gestational age and degree of illness. Upon admission, Dr. Wight determined that Dustin's prognosis was fairly optimistic because he was only in moderate distress and because of his gestational age.
Dr. Wight explained that RDS is the lack of a chemical called surfactant, which helps maintain lung volume. Dr. Wight noted that lung maturity does not necessarily coincide with gestational age; occasionally, term babies do not have sufficient quantities of surfactant in their lungs.
In managing Dustin's RDS, he was placed on oxygen, and his condition was monitored. When the oxygen tent was insufficient to assist Dustin in breathing, Dustin was placed on a ventilator. At that time, Dr. Wight also administered antibiotics, which is standard procedure until such time as an infection can be ruled out. On October 3, Dustin was weaned from the ventilator, but the following day, he developed mild pulmonary interstitial emphysema (PIE). Dr. Wight explained that PIE is a condition in which the lungs leak air out of the air sacs into the interstitial spaces. This condition is indicative of very sick lungs and can happen spontaneously or as a complication of ventilation therapy.
On October 6, the amount of mechanical ventilation was increased because Dustin was receiving inadequate oxygenation. On October 8, Dustin was removed from the ventilator and placed in the oxygen tent. However, Dustin did not do well and was placed on the ventilator again. By October 9, Dustin's RDS was resolving, and his lungs were becoming more mature. The results of his blood gas tests on October 11 showed that the oxygen levels were good.
However, later during the evening of October 11, Dustin's condition began to deteriorate. He became septic, which meant that he developed an infection in his blood. Dr. Wight testified that the infection was acquired either from the mother's stool at delivery or from the ventilation equipment. Dr. Wight treated Dustin with antibiotics.
On October 16, Dustin was diagnosed with a brain hemorrhage. Dr. Wight opined that the hemorrhage was caused by the sepsis. Sepsis causes a drop in the platelet count which results in an abnormal coagulation of the blood. Dustin remained hospitalized until January, 1986. At discharge, Dr. Wight's diagnoses were:
1. prematurity 36 weeksappropriate for gestational age;
2. severe RDS resolved;
3. rule out sepsis resolved;
4. physiologic hyperbilirubinemia resolved;
5. pseudomonas, sepsis, pneumonia resolved;
6. bilateral Grade III intraventricular hemorrhage with concomitant ischemic periventricular infarcts and severe neurologic deficit;
7. ceratia colonization; and
8. diabetes insipidus.
Dr. Wight opined that the less mature an infant, the higher the risk of developing infections. Dr. Wight testified that she saw no indication that there was anything at delivery, other than prematurity, which she could attribute as the cause of Dustin's problems. However, Dr. Wight stated that, at thirty-six (36) weeks, most babies would have more mature lungs. Moreover, given the severity of Dustin's illness, she would have been surprised if one week would have made any appreciable difference in the maturity of his lungs. Dr. Wight admitted that, if Dustin had been born one to two weeks later, he may still have had RDS, noting that term babies can have RDS, pneumonia, and sepsis. She stated that Dustin was one of those big babies that had severe immaturity of his lungs. Dr. Wight noted that Dustin's condition was relatively uncommon. In fact, Dr. Wight stated that intraventricular hemorrhage at thirty-six (36) weeks is "distinctly unusual," unless the baby is critically ill for some other reason. She also felt that the series of complications resulting in brain damage was a "rare" series of complications. Moreover, Dr. Wight noted that Dustin had several things going on, any one of which could be seen in almost any gestational age patient. Dr. Wight noted that maternal smoking, low socioeconomic group, and unmarried *792 mother are all factors which might increase a baby's risk of pre-term delivery.
In finding that Dr. Delgado's breach of the standard of care did not cause Dustin's injuries and death, the jury apparently believed that Dr. Delgado's substandard care did not cause an injury that the plaintiff would not have otherwise suffered. Dr. Wight's testimony revealed that Dustin's lungs were much more undeveloped than could have been anticipated in a thirty-six-week-old fetus. Dr. Wight noted that, even if Dustin had been born two weeks later, he might still have developed RDS and that his symptoms could occur in a patient of any gestational age. Moreover, Dr. Wight's characterization of the series of events in Dustin's short life as "unusual," "uncommon," and "rare" could have been interpreted by the jury to mean that Dustin's condition was not caused by his premature delivery and/or birth. We acknowledge that Ms. Hoot suffered a tragic loss because of the injuries and ultimate death of her son, Dustin. However, having carefully reviewed the entire record in this matter under the applicable standard of review, we cannot say that the jury erred in finding that any breach of the standard of care by Dr. Delgado did not cause the injuries and death of Dustin Hoot. There is a reasonable factual basis in the record to support the jury's verdict.

CONCLUSION
For the above reasons, the judgment of the trial court, in favor of Dr. Delgado and against Ms. Hoot, individually and as administratrix of the estate of her minor son, Dustin, dismissing her claims, is affirmed. Ms. Hoot is cast for all appeal costs.
AFFIRMED.
NOTES
[1] By judgment, dated September 14, 1994, Ms. Hoot voluntarily dismissed her claims against Woman's Hospital with prejudice.
[2] We note that the motion for appeal reveals that Ms. Hoot appealed both the judgment on the jury's verdict and the judgment denying the motions for JNOV and new trial. The assignments of error address the ruling on the motions for JNOV and the new trial, as well as the jury's verdict. However, the arguments in Ms. Hoot's brief do not address any error as to the trial judge's denial of her motions for new trial and JNOV. Therefore, the propriety of the trial court judgment with regard to the motions for new trial and JNOV is not before us on appeal. See Uniform RulesLouisiana Courts of Appeal, Rule 2-12.4. The only issue before us is whether the jury erred in finding that Dr. Delgado's breach of the standard of care did not cause Dustin's injuries and death.
[3] Dr. Delgado did not appeal the jury's determination that he breached the standard of care.